UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **RICHARD BERMAN, et al.,** | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07cv39 |
| | ) | |
| **CURT JOHNSON, et al.,** | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

In this breach of contract, fraud and copyright case, plaintiffs Richard Berman, Maura Flynn, and Speakeasy Video and defendants Curt Johnson and Indie Genius Productions sharply disputed the circumstances relating to the creation and production of the documentary film "Your Mommy Kills Animals" (YMKA). Plaintiffs' complaint sought a declaratory judgment regarding the ownership of the copyright to YMKA. Additionally, plaintiff Berman alleged in the complaint that defendants Curt Johnson and Indie Genius Productions had committed (i) breach of contract, (ii) fraud, and (iii) constructive fraud. Plaintiffs Flynn and Speakeasy Video alleged the same claims against defendants. Defendants Johnson and Indie Genius filed an answer denying all of plaintiffs' claims. Defendants also filed a counterclaim seeking a declaratory judgment regarding the ownership of the copyright to YMKA, and further alleging and seeking damages for (i) common law conspiracy to injure another in trade, business, or profession (against Berman and Flynn), (ii) tortious interference with a contract expectancy, prospective business relationship, and/or economic advantage (against Berman, Flynn, and Speakeasy); (iii) fraud (against Flynn), (iv) defamation (against Flynn), (v) conversion (against Flynn), and (vi) unjust enrichment (against Flynn and

1

Speakeasy). In the course of the trial, defendants withdrew all of their counterclaims save their request for declaratory judgment and their claim for defamation.

Following a three day trial, the jury returned verdicts as follows:

(i) In favor of plaintiff Berman on his breach of contract claim and awarding him $360,000 in damages;

(ii) In favor of plaintiff Berman on his actual fraud claim and awarding him $10,000 in compensatory damages, but no punitive damages;

(iii) In favor of plaintiffs Flynn and Speakeasy on their breach of contract claim and awarding $1 in nominal damages;

(iv) In favor of defendants Johnson and Indie Genius on plaintiffs Flynn and Speakeasy's actual fraud claim;

(v) In favor of plaintiffs Flynn and Speakeasy on their constructive fraud claim and awarding $1 in nominal damages; and

(vi) In favor of plaintiff Flynn on defendant Johnson's defamation claim.

Additionally, the jury was instructed, without objection, on the law relating to joint authorship of a work and directed in this regard to answer two interrogatories. The interrogatories and the jury's answers were as follows:

Do you find by a preponderance of the evidence that plaintiff Maura Flynn and defendant Curt Johnson intended that plaintiff Maura Flynn and defendant Curt Johnson would be the joint authors of the documentary? **YES**

Do you find by a preponderance of the evidence that plaintiff Maura Flynn's contributions to the documentary are independently copyrightable? **YES**

In accordance with the jury's verdicts, judgment was entered as follows:

(i) In favor of plaintiff Berman on his breach of contract claim and awarding him $360,000 in damages;

(ii) In favor of plaintiff Berman on his actual fraud claim and awarding him $10,000

2

        in compensatory damages, but no punitive damages;

        (iii) In favor of plaintiffs Flynn and Speakeasy on their breach of contract claim and awarding $1 in nominal damages;

        (iv) In favor of defendants Johnson and Indie Genius on plaintiffs Flynn and Speakeasy's actual fraud claim;

        (v) In favor of plaintiffs Flynn and Speakeasy on their constructive fraud claim and awarding $1 in nominal damages; and

        (vi) In favor of plaintiff Flynn on defendant Johnson's defamation claim.

No judgment was entered on the parties' declaratory judgment claims, as counsel were directed to file post-verdict briefs addressing the appropriate disposition of these claims in light of the jury's interrogatory answers. The parties complied and the matter is now ripe for disposition. At issue is whether the plaintiffs are entitled to their requested declaration of rights under the Declaratory Judgment Act, 28 U.S.C. § 2201. For the reasons that follow, plaintiff Flynn's request for declaratory relief on the copyright ownership issue must be granted, while plaintiff Berman's request for a declaration of rights relating to the promotion of YMKA must be denied.

## I.

The operative facts, briefly stated, are as follows.[1] Plaintiff Berman, a resident of McLean, Virginia, is president of the Washington-based public affairs firm Berman and Company. In this capacity Berman manages a number of non-profit organizations including the Center for Consumer Freedom (CCF), a coalition of restaurants, food companies and individuals "working together to

---

[1] When reviewing a jury verdict, it is appropriate to view the evidence in the light most favorable to the prevailing party. *Randall v. Prince George's County, Md.*, 302 F.3d 188, 201 (4th Cir. 2002).

promote personal responsibility and protect consumer choices."[2]  Among other efforts, the CCF opposes the activities and agenda of the People for the Ethical Treatment of Animals (PETA), an animal rights organization.[3]

Plaintiff Maura Flynn, a resident of Alexandria, Virginia, worked as a public relations officer for various organizations before becoming involved in the movie industry as a producer on the 2004 film "Michael Moore Hates America."  She is the owner of Speakeasy Video, LLC, a Virginia corporation.  Her husband, Michael Flynn, who provided trial testimony, was until recently an employee of Berman and Company.

Defendant Curt Johnson, a resident of Minneapolis, Minnesota, is a movie director and producer.  Like Flynn, Johnson worked as a producer on "Michael Moore Hates America," during which time the two became acquainted.

In the summer of 2005 Flynn and Johnson discussed the possibility of co-producing two documentary films, one focusing on smoking issues and a second focusing on PETA and the animal rights movement.  According to their initial arrangement, Flynn would direct the smoking movie while Johnson would direct the animal rights movie, and they would jointly produce both movies. Testimony introduced at trial indicated that the parties viewed these movies as a common project in which Flynn and Johnson were partners.  Flynn also prepared a 'treatment' document which

---

[2]Center for Consumer Freedom, *About Us*, http://www.consumerfreedom.com/about.cfm (last visited October 19, 2007).

[3]It is important to distinguish the animal rights movement from the animal welfare movement.  The animal welfare movement supports the humane treatment of animals but acknowledges the legitimate use of animals for food, clothing, companionship, and other proprietary purposes.  By contrast, the animal rights movement denies the legitimacy of human use or ownership of animals in any capacity or for any purpose.

4

outlined the essential content of the PETA/animal rights film.

In the fall of 2005, Johnson traveled to Washington D.C. and met with Berman and Flynn to explore whether Berman would be willing to invest money in the PETA/animal rights film which became YMKA. Testimony at trial indicated that the parties discussed a Deal Memo that outlined the financing agreement. Following that meeting Berman committed $300,000 to the production of YMKA, and production on the film began.

Filming of YMKA and the smoking film continued through 2006. During that time both Johnson and Flynn conducted interviews for both films, with Johnson focusing on YMKA and Flynn focusing on the smoking film, although each did some work on both. At some point in 2006, Johnson instructed Flynn not to travel with the crew that was working on YMKA. According to Johnson, he did so because potential interview subjects had become aware of Flynn's connection through her husband to Berman and Company and the CCF, and her presence would make them less willing to participate in YMKA.

Beginning in the late spring and continuing through the summer of 2006, a dispute arose between the parties regarding the content of the film as reflected in its early forms. Flynn made various editorial suggestions to Johnson, a few of which were accepted by him, but most of which were rejected. In fact, over time Johnson accepted less and less input from Flynn and ultimately ceased all communication with her. Johnson thereafter began publicly screening a substantially complete version of the film and contacted various film festivals and distribution companies regarding the general release of the film.

The YMKA film was received into evidence and played for the jury. As the viewing of the

film and the testimony confirmed, the great majority of the film is not directed to PETA, contrary to the treatment prepared by Flynn and contrary to the understanding Berman testified he had with Johnson. Specifically, roughly eighty percent of the film was devoted to a favorable portrayal of the SHAC-7, members of the animal rights group Stop Huntingdon Animal Cruelty (SHAC) who were tried and convicted for violations of the Animal Enterprise Protection Act, 18 U.S.C. § 43 (1993). Understandably, Berman was upset that so little of the film was dedicated to PETA and so much to the SHAC-7, particularly given Johnson's portrayal of the SHAC-7 as champions of free speech. Johnson denied that the portrayal was favorable, testifying that the SHAC-7 spoke for themselves and damned themselves by their own comments. This argument is belied by the fact that YMKA has been used as a fundraiser for the SHAC-7.

At issue now is whether plaintiffs are entitled to the declarations they request, specifically Flynn's request that she be declared joint author of YMKA and Berman's request that he be declared sole promoter of YMKA.

**II.**

Plaintiff Berman does not claim to be an author of YMKA but requests a declaration specifically recognizing his exclusive right to promote YMKA. Berman argues, as he testified at trial, that the Deal Memo embodies the terms of the parties' contract and contains a provision assigning to him the exclusive right to promote YMKA. Berman further argues that because the jury found that defendants had breached the Deal Memo, a declaration should now issue confirming that Berman owns exclusive promotional rights for YMKA.

The fata flaw in this argument is apparent. While the jury did find defendants in breach of

the contract, it also awarded Berman $360,000 in damages for this breach. Berman, therefore, has already received the only remedy to which he is entitled for the contract breach. To rule otherwise allows Berman a double recovery: (i) damages for the contract breach and (ii) specific performance of the contract. He is not entitled to both. It is settled in Virginia that "[t]he object of the law in awarding damages is to make amends or reparations by putting the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed." *Lehigh Portland Cement Co. v. Virginia S.S. Co.*, 111 S.E. 104, 109 (Va. 1922). As a result, "[a] plaintiff is not allowed to recover for a breach of contract more than the actual loss sustained by him, nor is he allowed to be put in a better position than he would have been had the wrong not been done and the contract not been broken." *Orebaugh v. Antonious*, 58 S.E.2d 873, 834 (Va. 1950); *see also* 22 Am. Jur. 2d, Damages §§ 27, 45. Granting Berman's request by declaring his exclusive right to promote the film would make him more than whole; it would put him in a "better position than he would have been" had the breach of contract not occurred. *Orebaugh*, 58 S.E.2d at 834. Having received his compensation for the contract breach, Berman is not also entitled to the contract's benefits beyond this.

There is a further flaw in Berman's argument: he also failed to ask for the relief he now seeks. Count I of the plaintiffs' complaint sought a declaratory judgment only as to ownership in the copyright to YMKA. Plaintiffs never sought a declaratory judgment or any other equitable relief with regard to the Deal Memo. And while Johnson sought a declaration naming him sole owner of "all exclusive rights" in YMKA, any declaration in response to this claim must be limited to Johnson's rights. Simply put, Berman now seeks relief he never requested.

7

### III.

Plaintiff Flynn seeks a declaration that she is a joint author of YMKA. In this regard, the jury found that Johnson and Flynn intended to be joint authors of YMKA and that Flynn's contributions to YMKA were independently copyrightable. Defendants now claim that the evidence does not support the jury's findings on this issue. The record belies this claim.

In reviewing a jury verdict, the evidence and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the prevailing party. *Randall*, 302 F.3d at 201. If, in light of such evidence, a reasonable jury could return a verdict in favor of the prevailing party, a reviewing court must defer to the jury's judgment. *Duke v. Uniroyal, Inc.*, 928 F.2d 1413,. 1417 (4th Cir. 1991).

The trial record contains abundant evidence supporting the jury's copyright findings, including (i) testimony from Michael Flynn that plaintiff Flynn and defendant Berman discussed YMKA as a joint project; (ii) testimony from plaintiff Flynn that she prepared a 'treatment' that outlined the essential elements of YMKA; (iii) testimony from plaintiffs Flynn and Berman that they discussed the treatment with defendant Johnson in the fall of 2005, and that Berman's involvement in YMKA was based on the film's anticipated adherence to the treatment; (iv) testimony from plaintiff Flynn that she drafted original questions for each of her interview subjects, and that her interviews were incorporated into YMKA; and (v) testimony from plaintiff Flynn that she drafted, compiled, and otherwise supplied a significant amount of information about various groups and individuals featured in YMKA. Presented with this evidence, the jury determined that Flynn and Johnson intended to be joint authors and that Flynn's contributions to the documentary were

independently copyrightable.  Viewed in the light most favorable to Flynn, this evidence is clearly sufficient to support the jury's verdict.

Defendants also argue, however, that Flynn is not an "author" under the Copyright Act. This argument highlights a circuit split regarding the requirements for joint authorship. Defendants cite to the Ninth Circuit's decision in *Aalmuhammed v. Lee*, which held that joint authorship requires a party (i) to make an independently copyrightable contribution and (ii) to establish "authorship" by demonstrating (a) control over the creation of the work, (b) "objective manifestations of a shared intent to be coauthors," and (c) audience appeal based on each contributor's contribution.  202 F.3d 1227, 1232 (9th Cir. 2000).  By contrast, the Second and Seventh Circuits hold that authorship of a joint work is established merely by "establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thompson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998); *see also Erickson v. Trinity Theater, Inc.*, 13 F.3d 1061, 1068–71 (7th Cir. 1994).[4]

The jury was instructed in accordance with the Second and Seventh Circuit approach, and defendants, who did not then object, cannot now argue that the Ninth Circuit's approach should control.  Defendants should have objected to the jury instructions at the instructions conference held before the instructions were given to the jury.  Fed. R. Civ. P. 51(c).  They had ample notice and opportunity to do so pursuant to Rule 51(b)(2), yet no objection was made.  Accordingly, defendants' argument based on the Ninth Circuit's *Aalmuhammed* decision was waived.  *See Hyde v.*

---

[4] In *Erickson*, the Seventh Circuit held that a work only qualifies as a "joint work" if each collaborator can be considered an "author," but decided that "authorship" is established by an independently copyrightable contribution.  13 F.3d at 1069–1071.

*Land-of-Sky Regional Council*, 572 F.2d 988, 992 (4th Cir. 1978) (ordinarily, failure to object to omission of a jury instruction precludes such a complaint on appeal); *Pogue v. Retail Credit Co.*, 453 F.2d 336, 338 (4th Cir. 1972) (same).

Even if defendants had timely objected, their argument would fail on the merits. The Second and Seventh Circuit rule is the better rule, for the Ninth Circuit's rule is susceptible to inequitable manipulation. Citing to *Aalmuhammed*'s principle that authorship requires control, defendants argue that because Johnson exercised complete control over YMKA, Flynn — who according to Johnson exercised no control — is not an author of YMKA. *See Aalmuhammed*, 202 F.3d at 1234 ("Control in many cases will be the most important factor [demonstrating authorship]."). While a strict application of the Ninth Circuit's rule would support defendants' argument, the facts highlight the rule's flaw. The record reflects that Flynn was contractually entitled to exercise control over YMKA and was only prevented from doing so by Johnson's wrongful conduct. It follows that to apply the Ninth Circuit's rule on these facts would violate the sensibly settled maxim that "no one should profit by his own conscious wrong." *Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253, 259 (4th Cir. 1950). It would be inequitable to allow Johnson to establish sole authorship of YMKA simply because he wrongfully prevented Flynn from exercising control. The Second and Seventh Circuit rule is the better rule, for it cannot be manipulated in this way, but even if the Ninth Circuit rule were applied equity would entitle Flynn to a declaration of joint authorship.

Accordingly, plaintiff Flynn is entitled to a declaration that she is the joint author of YMKA with all attendant rights and benefits. *See United States ex rel. Berge v. Board of Trustees of the University of Alabama*, 104 F.3d 1453, 1461 (4th Cir. 1997) (copyright co-owners "are treated as

tenants in common with each co-owner having an undivided, independent right to use the work, subject only to a duty of accounting for profits to other co-owners").

  An appropriate order will issue.

                    _____/s/_____

Alexandria, Virginia              T. S. Ellis, III
October 19, 2007              United States District Judge